UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

JAKE THOMAS GIPSON                      No. C 06-5445  WDB

         Plaintiff,                             ORDER

   v.

MICHAEL J. ASTRUE,
Commissioner of Social Security,

         Defendant.
_____/

INTRODUCTION

Plaintiff Jake Thomas Gipson moves for summary judgment, seeking judicial review of a final decision by the Commissioner of Social Security finding that he was not disabled and denying him Supplemental Security Income ("SSI") benefits. Defendant, the Commissioner of Social Security, opposes Plaintiff's motion and has filed a cross-motion for summary judgment, asking the Court to affirm the Commissioner's final decision. The matter was deemed submitted for decision by this court without oral argument, pursuant to Civil Local Rule 16-5. After careful review and consideration of the record and the papers submitted, the court hereby GRANTS defendant's cross-motion for summary judgment, DENIES Plaintiff's request for relief, and AFFIRMS the Commissioner's decision.

1

PROCEDURAL BACKGROUND

In 1987, applying the standard applicable to children, the Social Security Administration ("SSA") determined that Plaintiff (then age 4) was disabled due to a hearing impairment. After Plaintiff turned 18 in 2002, the SSA re-assessed his status, applying the standard applicable to adults. Applying that more demanding standard, the SSA concluded that Plaintiff's hearing impairment did not render him "disabled." For reasons unknown to us, Plaintiff did not appeal that adverse determination. Instead, in October of 2003, he submitted a new application for benefits. It is that application that is the subject of these proceedings.

Plaintiff's pending request for benefits was denied initially and on reconsideration. Plaintiff then requested and received a hearing before an Administrative Law Judge ("ALJ"). On June 1, 2005, the hearing was held before the Honorable David R. Mazzi. Plaintiff testified at the hearing. He was accompanied by a non-lawyer representative, Dr. Dan McCaskell, Ph.D. A vocational expert ("VE"), Robert Raschke, also testified. On September 21, 2005, Judge Mazzi issued a written decision, finding that Plaintiff was not disabled as defined by the Social Security Act and applicable regulations, and denying his request for SSI benefits.

Plaintiff then appealed to the Social Security Administration's Appeals Council, asserting that the ALJ abused his discretion and that the findings of the ALJ were not supported by substantial evidence. On June 29, 2006, the Appeals Council determined that there was no basis for review, and Judge Mazzi's decision became the final decision of the Commissioner of Social Security in Plaintiff's case. Plaintiff then filed his complaint in this federal court action seeking review of the decision. Both parties subsequently consented in writing to proceed before a United States Magistrate Judge.

STANDARD OF REVIEW

The district court may set aside the Commissioner's denial of disability insurance benefits only when the ALJ's determinations are based on legal error or are not supported by substantial evidence in the record as a whole. 42 U.S.C. § 405(g); *Tackett v. Apfel*, 180 F.3d

1094, 1097-98 (9th Cir. 1999) (citations omitted). "Substantial evidence" means more than a scintilla but need not be a preponderance; it is such evidence that a reasonable mind could accept as adequate to support a conclusion. *Richardson v. Perales*, 402 U.S. 389 (1971); *Meanel v. Apfel*, 172 F.3d 1111, 1113 (9th Cir. 1999). "If the evidence can support either outcome, the court may not substitute its judgment for that of the ALJ." *Tackett*, 180 F.3d at 1098, quoting *Matney v. Sullivan*, 981 F.2d 1016, 1018 (9th Cir. 1992).

## DISCUSSION

### A. APPLICABLE LAW - STEPS TO DETERMINING DISABILITY

An SSI claimant is considered disabled if (1) he suffers from a "medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than twelve months," and (2) the "impairment or impairments are of such severity that he is not only unable to do his previous work but cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy." 42 U.S.C. § 1382c(a)(3)(A), (B).

The Social Security Regulations set out a five-step sequential process for determining whether a claimant is disabled within the meaning of the Social Security Act. 20 C.F.R. § 404.1520. The five steps are:

> **Step 1.** Is the claimant presently working in a substantially gainful activity? If so, then the claimant is "not disabled" within the meaning of the Social Security Act and is not entitled to disability insurance benefits. If the claimant is not working in a substantially gainful activity, then the claimant's case cannot be resolved at step one and the evaluation proceeds to step two. See 20 C.F.R. § 404.1520(b).
>
> **Step 2.** Is the claimant's impairment severe? If not, then the claimant is "not disabled" and is not entitled to disability insurance benefits. If the claimant's impairment is severe, then the claimant's case cannot be resolved at step two and the evaluation proceeds to step three. See 20 C.F.R. § 404.1520©.
>
> **Step 3**. Does the impairment "meet or equal" one of a list of specific impairments described in the regulations? If so, the claimant is "disabled " and therefore entitled to disability insurance benefits. If the claimant's impairment neither meets nor equals one of the impairments listed in the regulations, then the claimant's case cannot be resolved at step three and the evaluation proceeds to step four. See 20 C.F.R. § 404.1520(d).

> **Step 4.** Is the claimant able to do any work that he or she has done in the past? If so, then the claimant is "not disabled" and is not entitled to disability insurance benefits. If the claimant cannot do any work he or she did in the past, then the claimant's case cannot be resolved at step four and the evaluation proceeds to the fifth and final step. See 20 C.F.R. § 404.1520(e).
>
> **Step 5.** Is the claimant able to do any other work? If not, then the claimant is "disabled " and therefore entitled to disability insurance benefits. See 20 C.F.R. § 404.1520(f)(1). If the claimant is able to do other work, then the Commissioner must establish that there are a significant number of jobs in the national economy that claimant can do. There are two ways for the Commissioner to meet the burden of showing that there is other work in "significant numbers" in the national economy that claimant can do: (1) by the testimony of a vocational expert, or (2) by reference to the Medical-Vocational Guidelines at 20 C.F.R. pt. 404, subpt. P, app. 2. If the Commissioner meets this burden, the claimant is "not disabled" and therefore not entitled to disability insurance benefits. See 20 C.F.R. §§ 404.1520(f), 404.1562. If the Commissioner cannot meet this burden, then the claimant is "disabled " and therefore entitled to disability benefits.

*Tackett*, 180 F.3d at 1098-99. The burden of proof is on the claimant as to steps one to four. *Id.* at 1098. At step five, the burden shifts to the Commissioner. *Id.*

B.   THE ALJ'S DECISION -- APPLICATION OF THE FIVE-STEP PROCESS

Applying the five-step evaluative process, the AJL first found that Plaintiff had not ever performed substantial gainful activity.

Next, the Judge found that Plaintiff had a "severe hearing loss in his left ear." (Tr. at 25).

Under step three, the ALJ found that Plaintiff's symptoms did not approach in severity the criteria listed in 20 CFR Part 404, Subpart P, Appendix 1, because "there is no evidence that [Plaintiff] has any significant impairment involving his better ear (right ear), as required for a finding of disability under Listing Section 2.08." (Tr. at 21). Given that determination, the ALJ was required to proceed to step four, where he determined Plaintiff's "residual functional capacity," or "RFC."

In step four, the ALJ concluded that Plaintiff had no past relevant work, for purposes of assessing whether Plaintiff is capable of returning to past relevant work. (Tr. at 21). The ALJ also found that Plaintiff's RFC included simple, repetitive work at all exertional levels, with the need to avoid concentrated exposure to loud noise, and no more than occasional conversations with supervisors, co-workers, and the public, due to auditory processing

4

limitations. (Tr. at 23). The ALJ believed that Plaintiff had the ability to communicate with others using normal tones in non-noisy environments — a skill Plaintiff demonstrated at the hearing. (Tr. at 23-24).

Given his findings in the first four steps, the ALJ was required to proceed to step five, where he assessed whether the Social Security Administration met its burden to show that Plaintiff was able to do work available in significant numbers in the national economy consistent with Plaintiff's medically determinable impairment, functional limitations, age, education and work experience.

Crediting the testimony of the vocational expert — based upon hypotheticals posed to the expert about Plaintiff's RFC — the ALJ found that Plaintiff was able to perform jobs existing in significant numbers in the regional and national economy, including, for example, numerous assembly jobs. The ALJ noted that "although the [Plaintiff] has significant limitations due to his hearing loss, and he has limited work experience, these adversities do not result in preclusion from all work, in light of [Plaintiff's] young age and ability to perform work at all exertional levels." (Tr. at 22). Accordingly, because he found that Plaintiff was still capable of working, the ALJ concluded that Plaintiff was not disabled within the meaning of the Social Security Act and, thus, that Plaintiff should not receive SSI benefits.

Judge Mazzi explicitly noted in his Opinion that Plaintiff's RFC was based upon "all of the evidence." (Tr. at 24). We describe the principal evidence relied upon by Judge Mazzi in the paragraphs that follow.

Judge Mazzi noted that the record contained four reports from hearing specialists who established that Plaintiff had a profound hearing loss in his left ear and normal hearing in his right ear. These reports include an August 5, 1992, report from otolaryngologist, Larry Schoenrock, M.D., who opined that Plaintiff had hearing within normal limits in the right ear, but that Plaintiff had a profound sensorineural loss in the left ear. (Tr. at 143). Dr. Schoenrock commented also that the hearing loss had remained stable since the last audiogram in November, 1989, and he recommended that Plaintiff return for a follow-up visit in three months. (Tr. at 143). The reports mentioned by Judge Mazzi also include a June 18,

2001, Audiology Evaluation by E. Gail Marcopulos, M.A., a clinical audiologist. Results from this evaluation again indicated that Plaintiff had hearing "well within normal limits for the right ear and a profound sensori-neural hearing loss for the left ear." (Tr. at 148). The report mentioned, too, that a hearing aid was not recommended because the only fitting appropriate would be the contralateral routing of signal ("CROS") fitting, which Plaintiff had used in the past and had found unsatisfactory. *Id.*

Plaintiff was evaluated again on July 21, 2003, by Marina Mulvey, M.A., another clinical audiologist. Plaintiff was referred to Ms. Mulvey by the Department of Rehabilitation. The results were consistent with the prior audiology reports and revealed "unchanged hearing thresholds, remaining stable in the normal range for the right ear and in the profound range for the left ear." (Tr. at 164). Ms. Mulvey recommended an amplification system to Plaintiff and suggested that Plaintiff return to the clinic for re-evaluation in one year or sooner, if necessary. *Id.* The fourth report, dated February 11, 2004, came from otolaryngologist, Dr. Adnan J. Hadeed, M.D. Dr. Hadeed did a head and neck evaluation of Plaintiff and reviewed Plaintiff's records. Dr. Hadeed's assessment, based on this exam and his review, was that Plaintiff had normal hearing on his right side and profound deafness on his left side. Dr. Hadeed also opined that Plaintiff had no speech impairment, and that he did not require a hearing aid. (Tr. at 165).

After reviewing the reports from the hearing specialists, the ALJ noted that the record also contained reports from other specialists that reflect that Plaintiff has difficulty with auditory processing, due to his hearing impairment. These reports include a January 9, 1997, Psychological-Educational Assessment Report from Dennis Watanabe, School Psychologist for Santa Rosa City Schools. (Tr. at 144). Mr. Watanabe conducted cognitive, achievement, and perceptual testing after Plaintiff was referred for a three-year reevaluation of his special education placement and services. *Id.* In a comprehensive report, Mr. Watanabe noted that Plaintiff's limited hearing did not seem to be a factor in his overall assessment performance and that, in class, his hearing seemed not to be a problem. (Tr. at 145). Nonetheless, Mr. Watanabe opined that Plaintiff's performance on the test of auditory attention, memory, and

reasoning fell below average, and that Plaintiff's "auditory processing and development should continue to be a major concern in [Plaintiff's] education progress." (Tr. at 146). In the summary of his report, Mr. Watanabe stated that Plaintiff's academic progress in reading and writing was satisfactory, but that he was extremely delayed in math. Mr. Watanabe concluded that Plaintiff continued to meet eligibility requirements for special education services.

The next report indicating that Plaintiff had a deficiency with auditory processing was an Auditory Processing Evaluation Report by speech-language pathologist, Debra Ross-Swain, Ed.D, dated August 3, 2004. Plaintiff was referred to Ms. Swain by Dan McCaskell, Plaintiff's vocational rehabilitation representative who accompanied Plaintiff to his hearing before Judge Mazzi. Ms. Ross-Swain administered a battery of tests and concluded that Plaintiff "experiences moderate to significant difficulty with specific skills of auditory processing." (Tr. at 175). In her recommendations about issues that may help Plaintiff in a vocational setting, Ms. Ross-Swain opined (1) that it would be necessary for a supervisor to offer a repetition/clarification of instructions and verify understanding; (2) that working in an environment with excessive ambient or competing noise would exacerbate Plaintiff's auditory processing deficiencies; (3) that office placement in a quiet environment would be preferred; (4) that warehouses or other incompetent acoustic environments would be unfavorable; (5) that Plaintiff's difficulty with auditory processing information should <u>not</u> be mistaken for limited intellectual ability; and (6) that Plaintiff has the ability to engage in vocational training and to perform successfully in a setting that is acoustically competent with limited distractions and competing noise. (Tr. at 183).

The material of record also includes a July 2003, report by Vocational Evaluator, Donna J. Luna, M.A., to whom Plaintiff was referred by the Department of Rehabilitation. Plaintiff was referred to Ms. Luna for a 3-day assessment to answer questions about Plaintiff's physical tolerance levels, general vocational aptitudes, vocational interests, worker behaviors, and learning styles. (Tr. at 149). During the evaluation, Plaintiff expressed an interest in computer graphics, auto mechanics, and data entry and warehouse work. *Id.* Ms. Luna's recommendation for Plaintiff was that he consider a data entry course or an entry-level data

entry job, or a job that required physical tasks. (Tr. at 155). Ms. Luna's rationale for this recommendation was based upon Plaintiff's score in the above average range on the data entry work samples he completed during the evaluation. *Id.* In addition to the vocational recommendation, Ms. Luna suggested that Plaintiff may need assistance in dressing for job interviews and with general personal hygiene. *Id.*

The record also contains evidence given directly by Plaintiff through his testimony at the hearing before Judge Mazzi. (Tr. at 236-257). At the outset of the hearing, Judge Mazzi asked Plaintiff if he could hear him. Plaintiff responded "yes." Plaintiff also mentioned that he did not wear a hearing aid because "he doesn't like hearing aids." (Tr. at 246).

Plaintiff testified that in the past he worked stocking shelves and retrieving carts at a retail store for less than six months. Plaintiff stated that his supervisors had him doing different things every day and, as a consequence, that he became confused and did not understand what he was supposed to do. Plaintiff said that some days he remembered what to do at his job, and that other days he did not remember.

Plaintiff testified that he also had a job at Blockbuster Video for almost a year, checking in and restocking videos.[1] Plaintiff did not work at the front counter with customers. Plaintiff testified that in this job, too, he would become confused trying to understand what his supervisors were ordering him to do, sometimes because the supervisor would speak very rapidly. Plaintiff also became confused when his job tasks changed or when the shelves for the various genres of movies were relocated. Plaintiff stated that he sometimes would become confused at Blockbuster even when his job remained the same from day to day. Plaintiff's job at Blockbuster ended because it was term limited. Plaintiff was not asked to leave specifically because of problems with his performance; though, as Plaintiff's representative pointed out, several other employees who were working at the store through the same school training

---

[1] As the ALJ noted in his Opinion (see Tr. at 21), Plaintiff's employment at Blockbuster did not amount to "significant past employment" under Step Four of the ALJ's analysis because the employment was not performed at the "substantial gainful employment" level, 20 C.F.R. § 416.965(a).

8

program were retained. Plaintiff believes that he was not retained because of his hearing problem.

In his senior year of high school, Plaintiff was transferred from special education classes to regular classes. Plaintiff testified that he did well in History his senior year because the class consisted of a lot of reading, and he could understand that, as opposed to a lot of talking by the teacher. Plaintiff said that it is better for him to get instructions from written material because it helps him gather the information. By contrast, in his senior English class, Plaintiff often felt very behind, because he could not keep up with the teacher's oral instructions. Plaintiff experienced the same problems in his driver's education class, where the teacher spoke "way too fast and a little too low." (Tr. at 254). Plaintiff received an "F" in driver's education. Plaintiff noted that in his special education class, prior to being transferred to regular classes, he understood everything the teacher said because she spoke loudly and clearly. (Tr. at 261).

With respect to Plaintiff's daily routine, Plaintiff stated that a normal day usually consists of writing stories, reading books, visiting friends, and listening to the radio. Plaintiff later added that the stories he writes are "fairly long" and that he does not have trouble remembering the plot of the story from one sitting to the next "because [he] ha[s] it all in his head....[i]t's stored up there." (Tr. at 255). Plaintiff stated that he did not use headphones when he listened to the radio, and that he could hear the radio fine if he turned it up loud. Plaintiff stated that he lives with his grandmother, and that he helps her around the house by taking out the trash and sometimes cleaning up. Plaintiff testified that it is very difficult for him to hear his grandmother and other people talking when there is ambient noise.[2]

Plaintiff's testimony at the hearing about his daily activities was consistent with evidence he provided in two "Daily Activities Questionnaires." (Tr. at 84-89; 104-109). In the questionnaires, Plaintiff wrote that he likes to read, write his own stories, play video

---

[2] Plaintiff's representative, Dan McMaskell, clarified on the record that Plaintiff's grandmother also may have a hearing problem, and that the problems communicating in their home may be due either to Plaintiff's or his grandmother's hearing loss, or both. (Tr. at 249).

games, eat, and listen to music.  Plaintiff also stated that he has tried to get a job but that he has been refused because he cannot hear.  (Tr. at 88).[3]  He mentioned, however, that while his social activities have not really changed because of his condition, he has to listen more carefully to people who are talking to him.  (Tr. at 107).   Plaintiff did not mention whether he participated in any specific sports, but the record includes a July 2003 report from the Sutter Medical Center of Santa Rosa, where Plaintiff was seen for a toe injury he sustained to his right second and third toes three days before while he was jetskiing.  (Tr. at 199).

Judge Mazzi also relied for his opinion upon  the testimony of a vocational expert, Robert Raschke.  (Tr. at 255-260; 263-281).  Mr. Raschke began by answering questions about the proper classifications for Plaintiff's past work and stated that in Plaintiff's retail store job, Plaintiff was doing work classified as light and unskilled.  Mr. Raschke acknowledged also that Plaintiff's employment at both the retail store and at Blockbuster was "sheltered employment," where, through Plaintiff's school and with funding from the Department of Rehabilitation, Plaintiff's employers were paid to give Plaintiff a job.

Mr. Raschke's testimony also consisted of answers to questions from the ALJ about the various jobs that would be available to a hypothetical claimant with a particular RFC.  In the first hypothetical, the ALJ asked the vocational expert to consider a situation with an individual who has a high school education with primarily special education classes, where the only physical limitation is a profound hearing loss in the left ear (normal hearing in the right ear), and where the person would have to avoid concentrated noise exposure but could hear normal conversation in a quiet setting such as an office.  (Tr. at 264).  After hearing this hypothetical, the vocational expert responded that a hypothetical claimant with the stated limitations  could perform the two jobs that Plaintiff had in the past.  (Tr. at 264).

---

[3] Though Plaintiff and his grandmother believe that Plaintiff has been turned down for jobs because of Plaintiff's hearing impairment, this may not be the only explanation for Plaintiff's difficulty finding work.  After meeting with Plaintiff, a vocational evaluator, Ms. Donna Luna, suggested in her report that Plaintiff may need assistance in dressing for job interviews and with general personal hygiene. Tr. at 155.  It is possible, therefore, that with vocational training that included assistance with interviewing skills and life skills, Plaintiff could dramatically increase his chances of being offered employment.

1     The ALJ then posed a second hypothetical to the vocational expert in which the claimant would have the same limitations as in the first hypothetical, but also would have limitations in being able to understand and follow instructions to perform a job — instructions would have to be repeated daily because of an auditory fatigue factor or some other factor — and the hypothetical claimant would make two or three mistakes a day. (Tr. 264-265). After hearing this modified set of assumptions, the vocational expert concluded that this "would shrink the labor market but it certainly wouldn't eliminate a person from competing." (Tr. at 265). The vocational expert clarified that this was assuming the claimant generally could stay on task, and only would have to be reminded on occasion about what he needed to do.

The ALJ posed a third hypothetical, where he added that the claimant only could perform "simple repetitive tasks," for unskilled work, with only *occasional* conversations with supervisors, the public, and coworkers. (Tr. at 265). Using this set of assumptions, the vocational expert advised that he believed such a claimant could not perform the two past jobs that Plaintiff had performed (at the retail store and at Blockbuster), but that such a claimant *could* perform other jobs that exist in significant numbers in the national economy. For example, the vocational expert mentioned that such a claimant could do janitorial work that was simple and repetitive, or could do various types of assembly work, such as filter assembler. In short, the expert believed that such a claimant was qualified to perform "task oriented" work as opposed to "people oriented" work. (Tr. at 267). The expert advised also that if the ALJ added as an additional restriction that the hypothetical claimant avoid concentrated noise exposure, there would be an erosion of about 40% of the jobs he recommended, but that a claimant with all of the restrictions could still find work that existed in significant numbers in the national economy.

Following the hypothetical questions from the ALJ, Mr. McCaskell, Plaintiff's representative asked the vocational expert to consider an additional hypothetical — one that factored in Plaintiff's low test scores in reasoning, math and language. To this, the vocational expert responded that the jobs he mentioned in the assembly field would not require numerical skills. (Tr. at 274). When questioned about how Plaintiff's poor auditory memory would

11

affect his ability to work, the expert advised that many simple one and two-step jobs are taught by simple demonstration. (Tr. at 276). He gave as an example the many jobs performed by people who do not speak English, who are taught their jobs not by oral instructions, but by simple demonstration or by watching someone in the workplace over an extended period of time. (Tr. at 276). Plaintiff's representative noted that Plaintiff's primary difficulty is with oral instructions, and that "we stipulate that he could probably read and carry out written instructions." (Tr. at 279).

The vocational expert ended his testimony by clarifying to the ALJ and to Plaintiff's representative that in his responses about the hypothetical claimants, he was assuming that the claimants did not *only* have a problem with hearing, but also had trouble processing information that is heard. (Tr. at 280). The ALJ agreed that a limited ability to process instructions was included in the hypothetical scenarios posed to the expert. (Tr. at 280).

Also in the record is evidence from Plaintiff's grandmother, Ellen Stover, about Plaintiff's daily functioning. (Tr. at 90; 110). The Function Reports completed by Plaintiff's grandmother stated that in his daily life Plaintiff takes care of his personal needs, reads, writes stories, looks for work, visits friends, spends time on the computer, watches television, goes shopping, and learns to cook. (Tr. at 90; 110). Ms. Stover wrote also that Plaintiff helps out with some chores, but that because of his hearing loss, he may not hear everything the first time, and she has to explain things step by step. (Tr. at 92). She mentioned, too, that Plaintiff does not drive a car because of his hearing loss. He walks, takes public transportation and gets rides from friends. (Tr. at 93). Ms. Stover also confirmed that Plaintiff has difficulty concentrating, understanding, and following instructions, and that instructions may need to be repeated before he gets it right, but that Plaintiff is "good" at following written instructions. (Tr. at 95). Ms. Stover reported that Plaintiff gets along with authority figures, if they understand that he has a hearing loss. (Tr. at 95). Finally, Ms. Stover commented that Plaintiff has been looking for work since he graduated from high school but that she believes his hearing loss is hurting his ability to find work. (Tr. at 97).

Also in the record are reports about Plaintiff's psychiatric and mental functioning. The reports conclude that Plaintiff is not significantly limited in these areas. (Tr. at 185-190). In addition, Dr. Pong, M.D., who reviewed Plaintiff's file, completed on March 1, 2004, a physical RFC assessment, in which he concluded that Plaintiff has no exertional limits, postural limits, manipulative limits, or visual limits. (Tr. at 166-173) Consistent with the other medical evidence in the record, Dr. Pong noted that "Plaintiff should not work where good hearing is required for both ears," but should be able to hear normal conversation without difficulty. (Tr. at 170).

### C.  REVIEW OF THE ALJ'S DECISION

Plaintiff asks this court to reverse the ALJ's decision of non-disability because, in Plaintiff's view, it is not based upon substantial evidence. Specifically, Plaintiff raises for review several issues that are grounded in Plaintiff's fundamental assertion that the ALJ failed properly to account for Plaintiff's severe impairment with auditory processing and focused instead only on Plaintiff's severe hearing loss in his left ear. This error, Plaintiff argues, resulted in an improper RFC and the erroneous conclusion that Plaintiff is capable of performing jobs that exist in significant numbers in the national economy. Plaintiff also raises for review the ALJ's failure to consider whether Plaintiff had a neurological disorder. Finally, Plaintiff complains that the ALJ improperly discounted Plaintiff's report of his symptoms.

1. *The ALJ's Findings and Conclusions About Plaintiff's Impairments and RFC Were Supported By Substantial Evidence of Plaintiff's Difficulty With Auditory Processing.*

Plaintiff seeks review of the ALJ's decision regarding Plaintiff's medically established impairments, Plaintiff's RFC, and the conclusion that, given a particular RFC, Plaintiff is capable of performing jobs that exist in significant numbers in the national economy. Underlying Plaintiff's complaints about the ALJ's decision is Plaintiff's fundamental argument that, in assessing Plaintiff's condition and arriving at an appropriate RFC, the ALJ considered

13

1 only Plaintiff's hearing loss and did not consider the substantial evidence that Plaintiff also
2 had a severe impairment with auditory processing.   We disagree.

3     "Substantial evidence" means more than a scintilla but less than a preponderance; it is
4 such evidence that a reasonable mind might accept as adequate to support a conclusion.
5 *Richardson v. Perales*, 402 U.S. 389 (1971);  *Meanel v. Apfel*, 172 F.3d 1111, 1113 (9th Cir.
6 1999).  As illustrated above in the extensive discussion of the evidence,  the ALJ made clear
7 in his opinion and throughout Plaintiff's administrative hearing that he considered, understood,
8 and agreed with the evidence that Plaintiff suffered from a significant limitation in auditory
9 processing and was not simply hearing impaired.  The ALJ reviewed carefully in his opinion
10 all of the medical evidence supporting this conclusion, and the ALJ explicitly noted that his
11 conclusion was based upon all of this evidence.  Indeed, the ALJ could not have been more
12 clear that he considered Plaintiff's impairment with auditory processing than when, in arriving
13 at Plaintiff's RFC, he concluded that:

> Based on the record as a whole, I find that the claimant has the residual functional capacity (RFC) for simple, repetitive work at all exertional levels, with the need to avoid concentrated exposure to loud noise, and no more than occasional conversations with supervisors, co-workers and the public, **due to auditory processing limitations**.

17 (Tr. at 23) (emphasis added).  The ALJ also stated in his opinion that "claimant's allegations
18 of confusion are reasonably interpreted to be the result of the auditory processing limitations
19 reflected in the medical record."  (Tr. at 23).

20     Moreover, the ALJ included these exact RFC limitations — and the additional
21 limitation that Plaintiff would have difficulty understanding and following instructions to
22 perform a job[4] — in the hypotheticals posed to the vocational expert that resulted in the

---

[4] *See* Tr. 264-65.  In his opening brief, Plaintiff argues that the ALJ did not include in Plaintiff's RFC the functional limitation that "it would be necessary for a supervisor to offer repetitive/clarification of instructions and verify understanding."  Plaintiff's Motion for Summary Judgement at 9:16-10:8. Plaintiff's argument is without merit.   The ALJ explicitly included this limitation in one of his hypotheticals to the vocational expert: "Before we get to other jobs, let me add an additional limitation and that would be a limited ability to understand and follow instructions required to perform the job, that is instructions would have to be repeated perhaps even daily, the same instructions with no significant change in the work setting because of an auditory fatigue factor or other reasons." Tr. at 264-65.

expert's opinion that Plaintiff was capable of working. Indeed, it is difficult to understand Plaintiff's argument that the AJL's decision failed to account for Plaintiff's auditory processing limitations, given the exchange between the ALJ and the vocational expert at the end of the hearing that clarified that the vocational expert had assumed in evaluating the hypotheticals that the claimant *not only* had a problem with hearing, but also had trouble processing information that is heard. (Tr. at 280).

Taking into account Plaintiff's auditory processing difficulties, including Plaintiff's need to have instructions repeated, Plaintiff's need to avoid concentrated noise exposure, and Plaintiff's need to have only occasional interactions with his supervisors, the vocational expert identified several categories of jobs for which Plaintiff would be qualified in the assembly field, among others. That Plaintiff is capable of working outside the home in such fields is amply supported by *all* of the medical evidence, which is consistent throughout the record.

For example, the vocational evaluator, Ms. Luna, indicated that Plaintiff scored well on a test for data entry skills and certainly was capable of performing a data entry job. Similarly, the report from the speech-language pathologist, Ms. Ross-Swain, indicated that Plaintiff's difficulty processing information should not be mistaken for limited intellectual ability. Ms. Ross-Swain further added that Plaintiff "has the ability to engage in vocational training and to perform successfully in a setting that is acoustically competent with limited distractions and competing noise." (Tr. at 183).

The conclusions of the ALJ and the vocational expert also are supported by the evidence in the record as reported by Plaintiff himself. Plaintiff noted that he spends a great deal of time reading, and adequately understands written instructions; that he is capable of remembering written materials, such as those he was required to recall for his senior level history class, and for the long fictional stories he writes in his free time; and that he can understand instructions after they are repeated in a step-by-step fashion. As the vocational expert pointed out, in many assembly jobs, instructions are provided in the form of a demonstration (as often may be necessary for non-English speaking employees), not solely as oral instructions. There also is the likely possibility that written instructions could be

provided. Importantly, on the record at the hearing, Plaintiff's representative, Mr. McCaskell, conceded that, "we stipulate that [Plaintiff] could probably read and carry out written instructions." (Tr. at 279).

In sum, based upon all of the evidence in the record, there simply is nothing to show that Plaintiff is not capable of working outside the home. Though Plaintiff is correct that the ALJ listed Plaintiff's severe impairment as being for "severe hearing loss in his left ear," the record could not be clearer that the ALJ understood that this severe impairment included a significant limitation in auditory processing. Accordingly, we conclude that the ALJ's opinion about Plaintiff's RFC and resulting ability to find work that exists in significant numbers in the national economy (relying upon the opinion of the vocational expert) is supported by substantial evidence and, on that basis, must be affirmed.

    2.    *The ALJ Did Not Commit Legal Error by Failing To Consider Whether Plaintiff had a Neurological Disorder*

Plaintiff next asserts that the ALJ committed legal error by failing to consider whether Plaintiff had a neurological impairment that rendered him disabled. Specifically, Plaintiff argues that he may fit into the definition of having "organic brain damage," as that disorder is defined in Listing 12.00(D)(8) of the relevant Social Security Regulations, and that the ALJ erred in not evaluating the implications of that Listing. Plaintiff's argument is without merit.

As set forth above, "[s]ubstantial evidence" means more than a scintilla but less than a preponderance; it is such evidence that a reasonable mind might accept as adequate to support a conclusion. *Richardson v. Perales*, 402 U.S. 389 (1971); *Meanel v. Apfel*, 172 F.3d 1111, 1113 (9th Cir. 1999).

Plaintiff raises the possibility that he has organic brain damage for the first time in this motion seeking review of the ALJ's decision. He never submitted any forms to the Commission claiming that this was a basis upon which he was seeking benefits. Nor did Plaintiff or any of the medical personnel who examined Plaintiff produce <u>any supporting evidence</u> about such a disorder. As noted by the ALJ in discussing Plaintiff's propensity for confusion during his job history: "the claimant testified that he became confused while

working as a stocker, but there is no evidence of any mental impairment that would cause confusion." (Tr. at 23).

Our careful review of the administrative record similarly reveals no evidence of brain damage or other severe neurological disorder. Plaintiff asserts in his Motion that an "appropriate specialist" used relevant tests to assess Plaintiff for "organic limits in memory, speech, and sustaining mental effort." *See* Plaintiff's Motion for Summary Judgement at 8:11-14. Plaintiff does not mention, however, who exactly this specialist was, and our review of the medical evidence has revealed no "appropriate" medical specialist, such as a neurologist, who would be competent to make an assessment about organic brain damage. The testing that was used to assess Plaintiff for problems with auditory processing, which included testing for memory and concentration, was done primarily by a school psychologist, Mr. Dennis Watanabe, and by a speech-language pathologist, Ms. Ross-Swain, neither of whom have medical degrees.

Accordingly, because there is no evidence, let alone substantial evidence, in the record to support a claim for organic brain damage or other neurological disorder, there was no reason for the ALJ to have evaluated Plaintiff's application for benefits on any such basis. Counsel provides no authority to the contrary, and we cannot find the ALJ's failure to consider whether Plaintiff had a neurological disorder as an appropriate ground to reverse the ALJ's thorough and thoughtful opinion.

3. *The ALJ Did Not Commit Legal Error By Questioning the Credibility of Some of Plaintiff's Statements About His Functional Capacity*

Third, Plaintiff seeks review of the ALJ's conclusion that "[t]o the extent that Claimant's statements constitute an assertion that his functional capacity is more restricted than found herein, they cannot be found to be fully credible." (Tr. at 23). Plaintiff also complains that the ALJ incorrectly noted that Plaintiff's grandmother's statements were not "necessarily consistent with disability." (Tr. at 23). As with Plaintiff's other arguments, we cannot conclude that the ALJ committed reversible legal error by making these statements.

17

In general, and within certain boundaries, credibility determinations are the province of the ALJ. "It is the ALJ's role to resolve evidentiary conflicts. If there is more than one rational interpretation of the evidence, the ALJ's conclusion must be upheld." *Allen v. Secretary of Health and Human Services*, 726 F.2 1470, 1473 (9th Cir. 1984), citing *Richardson v. Perales*, 402 U.S. 389, 399 (1971); *Sample v. Schweiker*, 694 F.2d 639, 642 (9th Cir. 1982). Subject to some legal conditions, an ALJ has discretion not to accept a plaintiff's testimony about h subjective condition. To justify discrediting the subjective evidence, however, the ALJ must articulate reasons or facts that are "sufficiently specific to permit the court to conclude that the ALJ did not arbitrarily discredit claimant's testimony." *See Thomas v. Barnhart*, 278 F.3d 947, 958 (9th Cir. 2002).

The ALJ may consider at least the following factors when weighing the claimant's credibility: reputation for truthfulness; inconsistencies either in the claimant's testimony or between testimony and conduct; daily activities; work record; and evidence from physicians and non-parties concerning the nature, severity, and effect of the symptoms of which the claimant complains. *Light v. Soc. Sec. Admin.*, 119 F.3d 789, 792 (1997).

Moreover, in determining whether a claimant is disabled, an ALJ must consider lay witness testimony. *See Dodrill v. Shalala*, 12 F.3d 915, 919 (9th Cir.1993). "Lay testimony as to a claimant's symptoms is competent evidence that an ALJ must take into account, unless he or she expressly determines to disregard such testimony and gives reasons germane to each witness for doing so." *Lewis v. Apfel*, 236 F.3d 503, 511 (9th Cir. 2001) (internal citations omitted).

Here, the ALJ did <u>not</u> discount any specific statement made by Plaintiff and did not discount the credibility of Plaintiff's testimony about his symptoms. To the contrary, the ALJ wrote in his opinion that "claimant has a medically determinable impairment that can reasonably be expected to produce the symptoms about which he complains," and that Plaintiff's complaints were found "essentially credible .... [but] do not preclude him from performing all substantial activity." (Tr. at 23). That the ALJ also noted that Plaintiff's views

18

about his functional capacity were not persuasive to the extent they were inconsistent with the other evidence is not to say that Plaintiff's description of his symptoms was not to be believed. Rather, the ALJ seems only to have been making a statement to support the legal conclusion that the symptoms Plaintiff reported did not amount to a disabling condition.

Similarly, with respect to the lay testimony provided by Ellen Stover, Plaintiff's grandmother, the fairest reading of the ALJ's statement is not that Ms. Stover's testimony was not credible but that, even if believed, it did not establish that Plaintiff was disabled. Indeed, there is no dispute that the ALJ *considered* Ms. Stover's testimony because the ALJ noted that Plaintiff's "grandmother's observations as to [Plaintiff's] ability to understand and concentrate also are reasonably interpreted to reflect claimant's significant auditory processing limitations." (Tr. at 23).

In sum, after a careful review of the entire administrative record, we conclude that, as a matter of law, the ALJ properly considered Plaintiff's testimony on the whole, and the testimony given by his grandmother, Ms. Ellen Stover.

Accordingly, we do not find any legal error requiring reversal, and we affirm in its entirety the ALJ's opinion.

## CONCLUSION

The administrative record shows that the ALJ's reasoning and conclusions about Plaintiff's impairment, RFC, and ability to perform jobs that exist in significant numbers in the national economy do not contain legal errors and are supported by substantial evidence. Accordingly, the court AFFIRMS the decision of the ALJ, GRANTS defendant's cross-motion for summary judgment, and DENIES Plaintiff's request for relief.

IT IS SO ORDERED.

Dated:   November  6, 2008

WAYNE D. BRAZIL
United States Magistrate Judge